Juan Cruz **VEGA**, Petitioner,

v.

**The PEOPLE of the State of Colorado, Respondent.**

No. 93SC670.

Supreme Court of Colorado, En Banc.

April 3, 1995.

Rehearing Denied April 24, 1995.

David F. Vela, State Public Defender, David M. Furman, Deputy State Public Defender, Denver, for petitioner.

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., John Daniel Daily, Deputy Atty. Gen., Robert Mark Russel, First Asst. Atty. Gen., Wendy J. Ritz, Asst. Atty. Gen., Crim. Enforcement Section, Denver, for respondent.

Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari to review *People v. Vega,* 870 P.2d 549 (Colo.App.1993).[1] In *Vega,* the court of appeals affirmed a judgment of conviction entered upon a jury verdict finding the petitioner, Juan Cruz Vega (Vega), guilty of possession with intent to distribute more than 28 grams of cocaine [2] and guilty as a special offender for introducing, distributing or importing a controlled substance into Colorado.[3] Vega asserts that the trial court denied him due process of law and the right to trial by jury in disallowing his affirmative defense to the special offender charge. He also contends that the trial court committed reversible error in excluding evidence of internal Drug Enforcement Administration (DEA) incentives for conviction of drug offenders.[4] We disagree and affirm the judgment of the court of appeals.

1. The issues posed by petitioner on which we granted certiorari are as follows:
    1. Whether the court of appeals' holding, that an accused is not entitled to a jury finding of guilt on the charge of importation of a controlled substance under the special offender statute, § 18–18–107, 8B C.R.S. (1986), violates federal and state constitutional guarantees to a trial by jury.
    2. Whether the court of appeals' holding, that an accused is not entitled to present the affirmative defense of entrapment, or any affirmative defense to a charge of importation of a controlled substance under the special offender statute, § 18–18–107, 8B C.R.S. (1986), violates federal and state constitutional guarantees to due process of law.
    3. Whether the court of appeals' holding, that Mr. Vega was not entitled to present relevant defense evidence of the DEA's internal reward system, violates federal and state constitutional guarantees to due process of law and confrontation.

2. § 18–18–105, 8B C.R.S. (1986) (repealed and reenacted at § 18–18–405, 8B C.R.S. (1993 Supp.)).

3. § 18–18–107, 8B C.R.S. (1986) (repealed and reenacted at § 18–18–407, 8B C.R.S. (1993 Supp.)).

4. Vega also argues that the instructions given by the trial court created a "fatal defect" in his trial because they required the jury to consider the charges against him in reverse chronological order and thus permitted the jury to consider only the activities and events occurring after importation and before the sale as evidence of entrapment. This argument is without merit. The arrangements and negotiations surrounding the sale of cocaine in this case occurred both before and after Vega's arrival in Colorado. Thus, we find that by limiting Vega's entrapment defense to the distribution charge, the trial court did not limit the jury's consideration of events and activities that occurred before Vega's arrival in Colorado which might have been indicative of entrapment. We will not consider this argument further.

## I.

The charges in this case were brought against Vega and two co-defendants, Charlie Cotto Aponte (Aponte) and Joe Garcia–Rodan (Garcia–Rodan), based on the sale of three kilograms of cocaine to drug enforcement officers on January 14, 1991. The sale was the culminating event of an investigation by the Jefferson County District Attorney's Office and the DEA. The investigation began in the fall of 1990 when the two agencies were contacted by John Anderson (Anderson) who was facing charges in Jefferson County and in Nevada. In exchange for a reduction of the charges against him and for leniency in sentencing, Anderson offered to cooperate with officials in obtaining the arrest and conviction of drug traffickers with whom he had contacts.

As part of the investigation, Anderson went to California and arranged for the sale and delivery of cocaine to Colorado through Aponte, his drug contact in California. In the course of arranging the deal, Aponte introduced Anderson to Vega. Negotiations with Aponte continued through January 13, 1991, when Aponte called Anderson to tell him that he had arranged the deal.

On January 14th the deal was finalized. That evening Anderson, Aponte, Garcia–Rodan and Vega flew to Denver with the cocaine. DEA agents met the group at the Denver airport and took them to a hotel in Wheat Ridge where the sale of three kilograms of cocaine to the agents was videotaped and Vega and his co-defendants were arrested.

Vega and his co-defendants were charged with distribution of cocaine pursuant to section 18–18–105 and as special offenders pursuant to section 18–18–107. All three defendants were convicted of the charges against them.

Vega asserted entrapment as an affirmative defense to both charges. The trial court refused to instruct the jury that the entrapment defense applied to the special offender

charge. It reasoned that the special offender statute did not define a substantive offense, but rather was a sentence enhancement provision to which an affirmative defense did not apply. The trial court also excluded as irrelevant cross-examination testimony concerning internal DEA incentives to promote the arrest and conviction of drug traffickers.

The jury found Vega guilty of distribution of cocaine and returned a special verdict that Vega had imported cocaine into Colorado. Based on the special verdict, the trial court found that Vega was a special offender subject to enhanced sentencing under section 18–18–107 and imposed a sentence of twenty-four years and one day.

On appeal, Vega argued that the trial court's failure to instruct the jury to apply his affirmative defense to the special offender charge denied him due process of law. Furthermore, Vega contended that this evidence was relevant to show the bias of DEA agents and to demonstrate DEA agents' motive to entrap him and thus was improperly excluded in violation of his Confrontation Clause rights.

The court of appeals disagreed and upheld Vega's conviction. It held that the special offender statute did not create a substantive offense but instead was merely a sentence enhancing provision. *Vega*, 870 P.2d at 552. Consequently, the court held, "no due process concerns are raised ... so long as the defendant receives reasonable notice of the potential for an increased sentence and the prosecution meets its burden of proof as to the aggravating factor alleged if it is contested." *Vega*, 870 P.2d at 551. The court of appeals also affirmed the trial court's decision to exclude the DEA evidence. *Id.* at 553.

## II.

On petition to this court, Vega first asserts that the trial court denied him due process of law[5] by refusing to instruct the

5. The due process clause of the Colorado Constitution, Colo. Const. art. II, § 25, requires at a minimum the same guarantees as those protected by the due process clause of the United States Constitution. *Air Pollution Variance Bd. v. Western Alfalfa Corp.*, 191 Colo. 455, 461, 553 P.2d 811, 816 (1976). The state may enlarge the federal concept of due process, but it may not abridge those rights. *People ex rel. Juhan v. District Court*, 165 Colo. 253, 261, 439 P.2d 741,

jury to apply his defense of entrapment to the special offender charge. Vega argues that the trial court incorrectly interpreted the statute as a sentence enhancing provision to which an affirmative defense did not apply. Furthermore, he contends that this treatment of the special offender statute violates due process limitations on the power of states to define criminal offenses because the provision improperly treats an element of the substantive crime as a sentencing factor. Vega argues that, by failing to apply the affirmative defense to the special offender charge, the trial court reduced the prosecution's burden of proof because the prosecution did not have to disprove the elements of entrapment beyond a reasonable doubt. The prosecution had to prove only the element of importation into Colorado. We disagree.

Under the Colorado Criminal Code, entrapment only may be asserted as an affirmative defense to "[t]he commission of acts which would otherwise constitute an *offense*." § 18–1–709, 8B C.R.S. (1986) (emphasis added).[6] The Code states that "[t]he terms 'offense' and 'crime' are synonymous and mean a violation of, or conduct defined by, any state statute for which a fine or imprisonment may be imposed." § 18–1–104(1). Thus, the distinction between statutory provisions that create a substantive offense and "sentence enhancers" which merely impact the degree of punishment imposed is important in this case to the extent it determines the availability of the affirmative defense of entrapment to special offender charges.

■ Due process guarantees to the criminal defendant that the prosecution must prove every factual element necessary to constitute the crime charged beyond a reasonable doubt before the defendant may be convicted and subjected to punishment. *McMillan v. Pennsylvania*, 477 U.S. 79, 84,

106 S.Ct. 2411, 2415, 91 L.Ed.2d 67 (1986); *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970); § 18–1–402 ("No person shall be convicted of any offense unless his guilt thereof is proved beyond a reasonable doubt."). Due process may also require that, when the accused presents an affirmative defense to an offense with which he or she is charged, the prosecution must prove the facts indicating the absence of the defense beyond a reasonable doubt as well as the elements of the offense itself. *Compare Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), *with Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). In Colorado, the State has assumed the burden of disproving affirmative defenses. *Lybarger v. People*, 807 P.2d 570, 579 (Colo.1991); § 18–1–407(2) ("If the issue involved in an affirmative defense is raised, then the guilt of the defendant must be established beyond a reasonable doubt as to that issue as well as all other elements of the offense."). Therefore, if the trial court erred in disallowing the defense, it improperly lightened the prosecution's burden of proof.

We first address Vega's contention that the trial court and the court of appeals improperly treated the special offender statute as a sentence enhancement provision rather than a substantive offense under Colorado statutory and case law. Because we find that the lower courts correctly classified the statute, we then address whether Colorado's classification violates constitutional due process limitations placed on the state's ability to define criminal offenses. We find that it does not.

### A.

Vega argues that the legislature intended for the special offender statute to create a

745 (1968). Here, Vega petitioned for certiorari review based on both federal and state constitutions but he does not argue that the due process guarantees under the state constitution are more protective than those available under the federal constitution. Accordingly, we will analyze this case only under the federal due process standards.

6. § 18–1–709 of the Colorado Criminal Code defines the defense of entrapment as follows:

The commission of acts which would otherwise constitute an *offense* is not criminal if the defendant engaged in the proscribed conduct because he was induced to do so by a law enforcement official....

(emphasis added). § 18–1–710 provides:

**Affirmative defense.** The issues of justification or exemption from criminal liability under sections 18–1–701 to 18–1–709 are affirmative defenses.

Entrapment thus is considered to be an affirmative defense to criminal responsibility.

substantive offense, not merely act as a sentence enhancing provision. According to Vega, the placement of this provision in the Criminal Code and legislative history indicating that the provision was enacted to combat drug trafficking demonstrate the legislature's intent to create a substantive offense. Furthermore, he asserts that this construction is consistent with our prior case law distinguishing sentence enhancement provisions from provisions defining substantive offenses. We disagree.

■ In construing statutes, we must give effect to the intent of the legislature by looking first at the language of the statute. *Moody v. Corsentino*, 843 P.2d 1355, 1370 (Colo.1993). Legislative intent is determined primarily from the plain language of the statute, and if the language of the statute is unclear or ambiguous, from the statute's legislative history. *General Electric Co. v. Niemet*, 866 P.2d 1361, 1364 (Colo.1994); *see City of Aspen v. Meserole*, 803 P.2d 950, 953–55 (Colo.1990).

■ While the appropriate classification of the special offender statute has not been directly before us,[7] we have considered "statutory provisions raising the level of a particular offense from one class of felony to another ... as sentence enhancers, as opposed to elements of the offense charged." *Armintrout v. People*, 864 P.2d 576, 580 (Colo.1993) (and cases cited therein). In *Armintrout*, we considered a provision in the statute defining the offense of second degree burglary which raised the class of felony from class 4 to class 3 if the building entered was a "dwelling." We held that the entry of a dwelling was not an element of the offense of second degree burglary, but was merely a sentence enhancing provision.[8] Because "[a] defendant still may be convicted of the underlying offense without any proof of the sentence enhancer," we held that the sentence enhancing element is not an element of an offense. *Id.; see also, People v. Lacey*, 723 P.2d 111, 113 (Colo.1986) (statute requiring court to sentence defendant to term "greater than the maximum in the presumptive range, but not more than twice the maximum authorized in the presumptive range" upon finding of aggravating circumstance is a "sentence enhancement statute"); *cf. People v. Eggers*, 196 Colo. 349, 585 P.2d 284, 286 (1978) (statute does not create a substantive offense where "the application of the statute is triggered only after a defendant has been found guilty of the substantive crime, and the special findings relate only to the sentencing for the substantive offense") (quoting *Brown v. District Court*, 194 Colo. 45, 569 P.2d 1390, 1391 (1977)).

Based on these criteria we have applied in the past, we find that the Colorado special offender statute is best characterized as a sentence enhancing provision rather than a substantive offense. The statute provides:

> **18–18–107. Special offender.** (1) Upon ... a felony conviction under this article, the presence of one or more of the following extraordinary aggravating circumstances designating the defendant a special offender shall require the court to sentence the defendant to a term greater than the presumptive range for a class 2 felony but not more than twice the maximum term for a class 2 felony authorized in the presump-

---

7. In *People v. Garcia*, 752 P.2d 570 (Colo.1988), we implicitly treated the special offender statute as a sentence enhancer, not as creating a substantive offense. We stated:

> The defendant's equal protection argument is without merit because the special offender statute does not proscribe precisely the same unlawful act. *Sentence enhancement* is required only when the defendant has unlawfully introduced, distributed, or imported the controlled substance into the state of Colorado. A defendant is thus subject to *sentence enhancement* if he has brought a controlled substance from outside Colorado into this state.

*Id.* at 586 (emphasis added). However, the issue was not raised directly in *Garcia*.

8. In *Armintrout*, the question before us was whether second degree burglary was a lesser included offense of first degree burglary. The elements of the two offenses were identical, except that first degree burglary required proof of assault or menacing of any persons or of being armed with explosives or a deadly weapon, while second degree burglary incorporated the provision that raised the class of felony from class 4 to class 3 if the building entered was a "dwelling." Since we found that entry of a dwelling was merely a sentence enhancing provision, and since the remaining elements of the offense were identical to first degree burglary, we held that second degree burglary was a lesser included offense.

tive range for the punishment of such felony:

.    .    .    .    .

(d) The defendant unlawfully introduced, distributed, or imported into the state of Colorado any schedule I or II controlled substance (contained in part 3 of article 22 of title 12, C.R.S.); or, with the intent to promote or facilitate the introduction, distribution, or importation of any schedule I or II controlled substance (contained in part 3 of article 22 of title 12, C.R.S.) into the state of Colorado, he aided, abetted, or advised another person to introduce, distribute, or import any schedule I or II controlled substance (contained in part 3 of article 22 of title 12, C.R.S.) into the state of Colorado; . . . .

§ 18–18–107.

A reading of the plain language of the statute indicates that (1) it is triggered only after a felony drug conviction, and (2) its effect is to increase the required sentencing range upon a finding of one of the specified "aggravating circumstances." It thus has the same effect as if it raised the level of the offense to a higher class of felony. *See* § 18–1–105(a)(IV), 8B C.R.S. (1994 Supp.) ("felonies are divided into six classes which are distinguished from one another by the . . . presumptive ranges of penalties"). Furthermore, the conviction for distribution of cocaine stands without proof of the sentence-enhancing factor of importation. These characteristics are indicative of a sentence enhancing provision under the criteria we identified in *Armintrout* and the cases preceding it.

The legislative history of the act supports this interpretation.[9] The special offender provision was added to the Controlled Substance Act, sections 18–18–101 to –109, 8B C.R.S. (1986) (repealed and reenacted at sections 18–18–101 to –605, 8B C.R.S. (1993 Supp.)), by amendment during its consideration in the House Judiciary Committee. *Hearing on H.B. 1405 Before the House Judiciary Committee*, 53rd Gen. Assembly, 1st Reg. Sess. (Audio Tape M1T–81, 18A, March

10, 1981 at 10:40 a.m.). The provision, including subsection (d) at issue here, was added at the urging of law enforcement officials and was intended to allow "enhanced penalties" for drug traffickers. *See id.* (Audio Tape M1T–81, 17A, March 5, 1981 at 3:15 p.m.) (testimony of Mark Pautler, Assistant Attorney General, Organized Crime Strike Force), (March 5, 1981 at 3:54 p.m.) (testimony of law enforcement officer)); *id.* (March 10, 1981 at 10:45 a.m.) (testimony of Joseph Mackey, Jefferson County Deputy District Attorney). The sponsor of the amendment, Representative Mielke, introduced the measure as a sentencing provision which would require judges to impose harsher penalties upon a finding of the enumerated extraordinary aggravating circumstances. *Id.* (March 10, 1981 at 10:40 a.m.). During discussion of the motion to adopt the amendment, Joseph Mackey, one of its drafters, testified that the special offender provision is "not a substantive charge, it's a sentencing enhancing provision." *Id.* (March 10, 1981 at 10:47 a.m.). The Senate Judiciary Committee adopted the bill without amendment to or discussion of the special offender provision. *See Hearing on H.B. 1405 Before the Senate Judiciary Committee*, 53rd Gen. Assembly, 1st Reg. Sess. (Audio Tape M1T–81, 34A, May 11, 1981 at 4:15 p.m.) Taken as a whole, deliberations indicate that legislators intended that the special offender provision would act as a sentencing provision and did not define a substantive offense.

Based on our consideration of the language of the statute, its legislative history, and the criteria we have applied in the past to distinguish substantive offenses from sentencing provisions, we conclude that Colorado's special offender statute is a sentencing provision to which affirmative defenses do not apply. We next address whether this provision violates due process limitations placed on the power of states to define criminal offenses.

B.

The responsibility for defining and punishing criminal behavior is traditionally allocat-

---

9. Discussion of H.B. 1405, the Controlled Substance Act, of which the special offender statute was part, is recorded during its consideration in the House Judiciary Committee on March 5, 1981 and March 10, 1981, and in the Senate Judiciary Committee on May 11, 1981.

ed to the states. While a state is not entirely free to reallocate or reduce burdens of proof in criminal cases, "the applicability of the reasonable doubt standard ... has always been dependent on how a State defines the offense that is charged in any given case." *McMillan,* 477 U.S. at 85, 106 S.Ct. at 2415 (citing *Patterson v. New York,* 432 U.S. at 211 n. 12, 97 S.Ct. at 2327 n. 12). Furthermore, a state may always dictate the weight to be given factors that courts would consider to bear on punishment. *See id.* at 89–91, 106 S.Ct. at 2417–18.

Where the existence of a fact affects the severity of punishment for the crime rather than the culpability of the accused, the Supreme Court has declined to constitutionalize the burden of proof. *Id.* at 92, 106 S.Ct. at 2419. A state's ability to define the elements of criminal offenses and specify aggravating and mitigating circumstances for sentencing purposes is limited, however, when it attempts to evade the high level of proof constitutionally required to establish criminal offenses by restructuring existing crimes to make some essential elements of the crime into sentencing factors instead. *See id.* at 86, 106 S.Ct. at 2416; *Mullaney v. Wilbur,* 421 U.S. at 698, 95 S.Ct. at 1889; *Winship,* 397 U.S. at 364, 90 S.Ct. at 1072.

In this case, the jury returned a special verdict finding beyond a reasonable doubt that Vega had imported cocaine into Colorado. Neither party has challenged the application of this standard of proof on appeal. Instead, the People expressly concede the applicability of the "beyond a reasonable doubt" standard. We disapprove of the court of appeals' opinion to the extent that it can be read to have addressed this question

and we decline to reach it.[10] We need address only whether the state has unconstitutionally allocated factual elements between the substantive offense of cocaine distribution and the special offender provision in question.

*McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, is the seminal Supreme Court case addressing the due process limitations on a legislature's ability to define the substantive elements of a crime. *See generally* Edward R. Becker, *Insuring Reliable Fact Finding in Guidelines Sentencing: Must the Guarantees of the Confrontation and Due Process Clauses be Applied?,* 151 F.R.D. 153 (1993); Deborah Young, *Fact–Finding at Federal Sentencing: Why the Guidelines Should Meet The Rules,* 79 Cornell L.Rev. 299 (1994). In *McMillan,* the Supreme Court considered the constitutionality of Pennsylvania's Mandatory Minimum Sentencing Act, 42 Pa. Cons. Stat. § 9712 (1982), under the Due Process Clause. The Act mandated a minimum sentence of five years imprisonment upon conviction of certain felonies if the sentencing judge found, by a preponderance of the evidence, that the felon "visibly possessed a firearm" during commission of the offense. *See id.* at 81, 106 S.Ct. at 2413. The petitioners' principal argument was that the visible possession of a firearm was an element of the crimes for which they were being sentenced and thus must be proved beyond a reasonable doubt. The Supreme Court held that possession of a firearm was not an element of the underlying crimes to which the Act could be applied and upheld the statute.

The *McMillan* court declined to provide a bright line test for determining when a fact

---

**10.** In *McMillan,* The Supreme Court pointed out that it had "rejected the claim that whenever a State links the 'severity of punishment' to 'the presence or absence of an identified fact' the State must prove that fact beyond a reasonable doubt." 477 U.S. at 84, 106 S.Ct. at 2415. Nevertheless, the Court recognized that the Due Process Clause limits the ability of states to reduce the burden of proof applicable to elements of an offense, *id.* at 85, 106 S.Ct. at 2415, but declined to "define precisely the constitutional limits" on the states' ability. *Id.* at 86, 106 S.Ct. at 2416. Considerable disagreement exists concerning what limits *McMillan* defined. *Compare* Kevin R. Reitz, *Sentencing Facts: Travesties of*

*Real–Offense Sentencing,* 45 Stan.L.Rev. 523, 542–545 (1992–93) (quintupling of sentence by operation of statute upheld in *McMillan* means "standard has little or no force") *with* Richard Husseini, Comment, *The Federal Sentencing Guidelines: Adopting Clear and Convincing Evidence as the Burden of Proof,* 57 U.Chi.L.Rev. 1387, 1395–1404 (1990) (*McMillan* requires more than preponderance of evidence standard for federal sentencing factors). *See generally,* Deborah Young, *Fact–Finding at Federal Sentencing: Why the Guidelines Should Meet The Rules,* 79 Cornell L.Rev. 299, 334–41 (1994) (discussing application of *McMillan* by federal circuit courts of appeals).

constitutes an element of a particular offense as opposed to a sentencing factor for purposes of due process analysis. *McMillan,* 477 U.S. at 91, 106 S.Ct. at 2418. Nevertheless, the Court noted controlling differences between the case it was considering and prior cases that had addressed the limitations on a state's ability to define criminal offenses for purposes of due process analysis. While the factors that the Court found dispositive were not exclusive, they will guide our analysis in this case.

The first factor that the Court found to be controlling was the degree to which the existence of the fact in question determines the sentence imposed. The Court pointed to *Mullaney,* 421 U.S. 684, 95 S.Ct. 1881, which invalidated a statute where "once the State proved the elements which Maine required it to prove beyond a reasonable doubt the defendant faced 'a differential in sentencing ranging from a nominal fine to a mandatory life sentence.'" *McMillan,* 477 U.S. at 87, 106 S.Ct. at 2416. The Court noted that, unlike the *Mullaney* statute, the Pennsylvania statute under its consideration neither:

> alters the maximum penalty for the crime committed nor creates a separate offense calling for a separate penalty; it operates

solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it without the special finding of visible possession of a firearm.

*Id.* at 88, 106 S.Ct. at 2417. However, the court stopped short of finding that factors which alter the maximum penalty for the underlying offense must be considered elements of the offense. As the court stated:

> Petitioner's claim that visible possession under the Pennsylvania statute is 'really' an element of the offenses for which they are being punished—that Pennsylvania has in effect defined a new set of upgraded felonies—would have *at least more superficial appeal* if a finding of visible possession exposed them to greater or additional punishment ... but it does not.

*Id.* at 88, 106 S.Ct. at 2417 (emphasis added).[11] Nevertheless, the Court found this feature to be one indication that the statute was not "tailored to permit the [sentencing factor] to be a tail which wags the dog of the substantive offense," as was the case in *Mullaney.* *McMillan,* 477 U.S. at 88, 106 S.Ct. at 2417.

Similarly, the Court distinguished *Specht v. Patterson,* 386 U.S. 605, 607, 87 S.Ct. 1209,

---

**11.** State and federal courts that have addressed the constitutionality of such sentencing statutes have declined to find that an increase in the maximum penalty for an offense is a *per se* due process violation. According to these courts, such a penalty increase is only one consideration among others in determining whether elements of a substantive crime have been improperly treated as sentencing factors. *E.g., Nichols v. McCormick,* 929 F.2d 507 (9th Cir.1991), *cert. denied,* 502 U.S. 1115, 112 S.Ct. 1226, 117 L.Ed.2d 461 (1992) (rejecting "narrow reading of *McMillan*" that would require factor that operated to increase a sentence beyond the maximum permitted by the underlying offense to be considered an element of the offense; upholding statute that required "in addition to the punishment provided for the commission of [the underlying] offense," a term of imprisonment "not less than 2 years or more than 10 years"); *United States v. Rumney,* 867 F.2d 714, 718–719 (1st Cir.), *cert. denied,* 491 U.S. 908, 109 S.Ct. 3194, 105 L.Ed.2d 702 (1989) ("maximum sentence enhancers should be treated in the same manner as minimum sentence enhancers"; upholding sentencing provision that increased punishment from maximum of two years to minimum of fifteen years upon finding of three predicate felonies); *United States v. Lowe,* 860 F.2d 1370, 1379

(7th Cir.1988), *cert. denied,* 490 U.S. 1005, 109 S.Ct. 1639, 104 L.Ed.2d 155 (1989) (*McMillan's* "'greater or additional punishment' analysis was not intended to be the sole test for measuring whether a sentencing factor becomes an element of the offense"; upholding same statute); *Field v. Sheriff of Wake County,* 831 F.2d 530, 536 (4th Cir.1987) (upholding sentencing statute that imposed increased maximum penalty for drunk driving upon judge's finding of serious injury); *People v. Eason,* 435 Mich. 228, 458 N.W.2d 17, 21–24 (1990) (sentencing statute allowed imposition of "not more than twice the term otherwise applicable" upon conviction of second or subsequent offense under article; court noted increased maximum penalty, but found dispositive that "the factor here made relevant for sentencing purposes ... historically has been considered one of the most significant factors bearing on appropriate punishment."); *State v. Krantz,* 241 Mont. 501, 788 P.2d 298, 303, *cert. denied, Krantz v. Montana,* 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 306 (1990) (declining to establish a "bright line" test based on increased maximum penalty; upholding statute that required "in addition to the punishment provided for the commission of [the underlying] offense," a term of imprisonment "not less than 2 years or more than 10 years").

1210, 18 L.Ed.2d 326 (1967). In *Specht,* the Court invalidated a Colorado statute which allowed the sentencing judge to impose a life sentence upon a finding that the defendant posed "a threat of bodily harm to members of the public, or is an habitual offender and mentally ill" where the offense otherwise carried a maximum penalty of ten years. The *McMillan* court found the dispositive distinction between the Pennsylvania statute and the *Specht* statute to be the authority given the court under the *Specht* statute to make findings that greatly affected the possible sentence but which could be made without notice to the defendant or a hearing. *Id.* at 89, 106 S.Ct. at 2417. It also noted that the *McMillan* statute did not "up the ante" to the same degree as the *Specht* statute. *Id.*

The final relevant consideration highlighted by the *McMillan* court was whether it appeared that the state legislature had attempted to avoid the due process requirements of *Winship* by changing the elements of the underlying offense at the time it enacted the sentencing provision in question. *Id.* It found that this was not the situation presented by enactment of the Pennsylvania statute. The Pennsylvania statute did not change the definition of any existing offense nor was its allocation of the elements of the offense contrary to "Anglo–American legal tradition." *Id.*

■ In this case, the *McMillan* considerations weigh in favor of finding Colorado's special offender statute to be constitutional. First, the special offender statute does not allow the aggravating circumstance of importation to be the "tail that wags the dog" of the substantive offense, distribution of cocaine. The underlying offense, distribution of 28 ounces or more of cocaine, carries a presumptive penalty range of four to twelve years. *See* § 18–18–105(3) (requiring minimum penalty set out in § 18–1–105(1)(a) for distribution of 28 grams of cocaine or more); § 18–18–105(2)(a) (classifying offense of cocaine distribution as class 2 or class 3 offense); § 18–1–105(1)(a)(IV) (prescribing class 3 presumptive range of 4 to 16 years and class 2 presumptive range of 8 to 24 years). The special offender statute requires the court to sentence the defendant "to a term greater than the presumptive range for a class 2 felony but not more than twice the presumptive range for the punishment of such felony." § 18–18–107(1). This sentencing range equates to a term of more than 24 but less than or equal to 48 years. While the provision requires the sentencing judge to impose a greater sentence than otherwise is available under section 18–18–105, the presumptive range imposed by the statute does not change the nature or the magnitude of the penalty to an extent that is disproportionate to the penalty imposed for the underlying substantive offense, as was the case in both *Mullaney* and *Specht.* Nor does the special offender statute drive the penalty determination entirely, as was the case in *Mullaney.*

Second, while the special offender statute does not require notice and an opportunity for a hearing on the existence of sentence enhancing factors, Colorado has engrafted these procedural protections onto sentence enhancing statutes. *See Lacey,* 723 P.2d at 113; *see also, Oyler v. Boles,* 368 U.S. 448, 452, 82 S.Ct. 501, 503, 7 L.Ed.2d 446 (1962) ("a defendant must receive reasonable notice, and an opportunity to be heard relative to the [sentence enhancing factor] even if due process does not require that notice be given prior to trial on the substantive offense."); *Garcia,* 752 P.2d at 586–87; § 2–4–201(1)(a), 1B C.R.S. (1980) (it is presumed that compliance with the state and federal constitutions is intended). Furthermore, in this instance, Vega had notice of the possibility of sentence enhancement under the special offender statute through separate charges and received the benefit of a special jury verdict on the question of importation and a jury instruction requiring the jury to find the element of importation "beyond a reasonable doubt." Thus, Vega had the benefit of procedural protections not available to the accused in *Specht.*

Finally, there is no indication that the special offender provision was designed to evade the level of proof constitutionally required to establish a criminal offense by restructuring Colorado's distribution offense to make an essential element of a crime a sentencing factor, or by creating in effect a separate

offense with a lower burden of proof. The legislative history of the provision shows no indication of such an intent. The Controlled Substances Act was drafted with the goals of increasing the number of regulated drugs and achieving more equitable enforcement. *Hearing on H.B. 1405 Before the House Judiciary Committee, supra* (March 5, 1981 at 2:40 p.m.) (introductory comments of bill sponsor, Representative Spelts). The addition of a special offender provision was spurred by lawmakers' concern that penalties which were effective for small scale drug dealers were "all in a day's work" for large scale distributors. For larger distributors, the financial gains from organized criminal activity more than offset the available penalties. *See id.* (March 5, 1981 at 3:25 p.m.) (comments of Representative Spelts). The special offender provision was intended to allow sentencing that would constitute a meaningful penalty for both independent small drug distributors and drug traffickers who are part of a larger organization. *Id.* (March 10, 1981 at 10:40 a.m.) (introductory comments of amendment sponsor, Representative Mielke).

Neither does the text of the provision indicate an attempt to allow prosecutors to evade the constitutionally mandated burden of proof. The Controlled Substance Act, §§ 18–18–101 to –109, is similar to the Uniform Controlled Substance Act. *Compare* Uniform Controlled Substance Act (U.L.A.) § 401 *with* § 18–18–105. *See also* Uniform Controlled Substance Act (U.L.A.), General Statutory Note (1988 & 1994 Supp.); *Hearing on H.B. 1405 Before the House Judiciary Committee, supra* (March 5, 1981 at 2:40 p.m.) (introductory comments of bill sponsor, Representative Spelts). The special offender provision was modelled on the federal special offender statute, 21 U.S.C. § 849 (repealed effective 1984), and did not involve any modification to the underlying offenses defined in the Controlled Substances Act. *Hearing on H.B. 1405 Before the House Judiciary Committee, supra* (March 10, 1981 at 10:40 a.m.) (introductory comments of Representative Mielke). The provision allows judges to impose stiffer sentences for the same underlying offenses when they find the enumerated factual indications that the felon was involved

in larger scale drug operations. *See id.* (March 10, 1981 at 10:40 a.m.) (comments of drafter Joseph Mackey).

The aggravating circumstances identified in the special offender statute that indicate participation in a larger organization appropriately bear on punishment, rather than on the offense of distribution. This is true because the underlying offense causes the same harm whether an individual performs it independently or as part of a larger organization. A higher penalty properly addresses the different level of deterrence necessary to dissuade the large scale drug pusher rather than the culpability of the offender. Accordingly, we find that there is no evidence that the provision was intended to allow prosecutors to evade the constitutionally mandated burden of proof.

After taking into account these factors considered by the Supreme Court in *McMillan,* we conclude that the Colorado special offender statute does not unconstitutionally classify the element of importation as a sentencing factor. Thus, we hold that Vega was not entitled to assert an affirmative defense to the special offender charges against him.

### III.

Vega argues that, in addition to denying him due process of law, the trial court's failure to instruct the jury to apply his affirmative defense to the special offender charge denied him the right to a jury verdict because the special jury verdict that he received did not represent a finding on both the questions of importation and entrapment. Likewise, because the jury made no finding concerning entrapment as it affected his decision to import cocaine into Colorado, he argues that this omission cannot be considered harmless error. The harmless error standard requires a court to determine whether the error would have affected the verdict rendered. Since the jury rendered no verdict on this question, projecting the verdict would be purely judicial speculation. *See Sullivan v. Louisiana,* —— U.S. ——, —— ——, 113 S.Ct. 2078, 2081–82, 124 L.Ed.2d 182 (1993). Because we find that the special offender statute is not a substantive offense

to which an affirmative defense is available, we also hold that Vega was not denied his right to trial by jury on the issue of entrapment as it affected his decision to import cocaine into Colorado.

## IV.

Vega finally contends that the trial court improperly excluded cross-examination testimony concerning internal DEA incentive programs for obtaining drug convictions. Based on Vega's offer of proof, the trial court decided to exclude the cross-examination testimony on grounds of relevancy. The trial court found that the test for entrapment focused on the subjective state of the defendant and police conduct, not the motivations behind police conduct. Thus, the trial court held, insofar as Vega presented the evidence to demonstrate the motivation of the DEA officers to move the sale to Colorado, the evidence was irrelevant to his entrapment defense. The court of appeals agreed and upheld the trial court's ruling.

Vega claims that this testimony was relevant to show the DEA agents' motivation to entice Vega to import the cocaine to Colorado and also to indicate bias in their testimony concerning Vega's involvement in the sale of cocaine. The exclusion of this testimony constituted an abuse of discretion by the trial court and violated his confrontation rights under the Sixth Amendment of the United States Constitution and under Article II, section 16 of the Colorado Constitution[12] and thus requires a new trial, Vega argues. We disagree.

The Confrontation Clause of the United States Constitution guarantees the right of a criminal defendant to cross-examine witnesses testifying for the prosecution. *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *Merritt v. People,* 842 P.2d 162, 165 (Colo. 1992). "[I]t is constitutional error to limit excessively a defendant's cross-examination of a witness regarding the witness' credibility, especially cross-examination concerning

the witness' bias, prejudice, or motive for testifying." *Merritt,* 842 P.2d at 167.

However, a trial court has "wide latitude ... to place reasonable limits on cross-examination based on concerns about, for example harassment, prejudice, confusion of the issues or interrogation which is repetitive or only marginally relevant." *Id.* at 166; *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435. Likewise, "the trial court has discretion to determine the scope and the limit of cross examination, and absent an abuse of discretion, its ruling will not be disturbed on review." *People v. Harris,* 762 P.2d 651, 660 (Colo.1988) (citations omitted); *People v. Raffaelli,* 647 P.2d 230, 234 (Colo.1982).

With these guidelines in mind, we consider whether the exclusion of this testimony constituted an abuse of discretion by the trial court and violated Vega's confrontation rights under the Sixth Amendment. First we will consider whether the trial court erroneously excluded this cross-examination testimony as irrelevant to Vega's entrapment defense, then we will consider whether the trial court erred in excluding this testimony for purposes of demonstrating the bias of DEA agents who testified against Vega.

### A.

The defense of entrapment is defined by section 18–1–709 as follows:

**Entrapment.** The commission of acts which would otherwise constitute an offense is not criminal if the defendant engaged in the proscribed conduct because he was induced to do so by a law enforcement official or other person acting under his direction, seeking to obtain evidence for the purpose of prosecution, and the methods used to obtain that evidence were such as to created a substantial risk that the acts would be committed by a person who, but for such inducement, would not have conceived of or engaged in conduct of the sort induced. Merely affording a person an opportunity to commit an offense is

---

12. We have held that Article II, section 16 of the Colorado Constitution is "congruent with the United States Constitution, amendment VI."

*Lucero v. People,* 173 Colo. 94, 96, 476 P.2d 257, 259 (1970).

not entrapment even though representations or inducements calculated to overcome the offender's fear of detection are used.

§ 18–1–709. In *Bailey v. People,* 630 P.2d 1062 (Colo.1981), we held that this provision creates a subjective test that focuses on the state of mind of a particular defendant, and does not set a general standard for police conduct. *Id.* at 1065 n. 5. Later, in *Evans v. People,* 706 P.2d 795 (Colo.1985), we clarified that *Bailey* does not mean that police conduct should be ignored, but rather that "the existence of any predisposition on the part of the defendant must be determined first, then the extent of any such predisposition must be considered in relation to the character of the inducements." *Evans,* 706 P.2d at 799. In particular, a jury must consider whether the methods used to obtain the evidence in question "were such as to create a substantial risk that this particular defendant would engage in the sort of conduct induced" and "were more persuasive than merely affording the defendant an opportunity to commit an offense." *Id.* at 801 n. 6 (suggested jury instructions).

It follows from this construction of the entrapment statute that, while police *methods* are relevant to the defense of entrapment, police *motives* are not relevant because they do not impact on the subjective state of mind of the defendant. In this case we agree that evidence of internal DEA incentives for obtaining drug convictions may have demonstrated DEA agents' motives for inducing the defendant to import cocaine to Colorado. However, under the entrapment statute, only the actual methods that they employed are relevant to Vega's defense. Accordingly, we affirm the trial court's ruling on Vega's offer of proof.

## B.

■ The prosecution correctly argues that Vega did not properly preserve for review the question of whether cross-examination testimony concerning internal DEA incentives was relevant for purposes of establishing bias in DEA agents' testimony. However, we agree with Vega that evidence of internal DEA incentives for drug convictions

is relevant to demonstrate DEA agents' interest in the outcome of the proceedings in this case. Therefore, because the exclusion of cross-examination evidence bearing on the credibility of a prosecution witness carries Confrontation Clause implications, we will address this issue despite Vega's failure to raise it before the trial court. *See* C.A.R. 1(d); *Mount Emmons Mining Co. v. Town of Crested Butte,* 690 P.2d 231, 238 (1984) (court may notice errors appearing of record when errors are of a fundamental nature affecting the judgment itself). We find that the trial court's exclusion of this testimony was improper, but that the exclusion was "harmless beyond a reasonable doubt." *See Van Arsdall,* 475 U.S. at 674, 106 S.Ct. at 1432; *Merritt,* 842 P.2d at 169.

■ A criminal defendant need not show "outcome determinative" prejudice in order to state a Confrontation Clause violation. *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435. Instead, "the focus of the prejudice inquiry in determining whether the confrontation right has been violated must be on the particular witness, not on the outcome of the entire trial." *Id.* at 680, 106 S.Ct. at 1435. A criminal defendant:

states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, thereby "to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness."

*Id.* (citation omitted). Thus, in *Van Arsdall,* the Supreme Court held that, while a trial court has wide latitude to limit cross-examination, "[b]y thus cutting off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony, the court' ruling violated respondent's rights." *Id.* at 679, 106 S.Ct. at 1435.

■ This case presents a similar situation. Here, the trial court excluded all cross-examination testimony concerning internal DEA incentives for agents to obtain convic-

tions of drug traffickers. This testimony would have revealed the specific benefits that would accrue to the agents should Vega be convicted of the charges against him and would have demonstrated the DEA agent's "motive[s] for favoring the prosecution" and strong interest in the outcome. Accordingly, we find that the trial court's exclusion of this testimony violated Vega's Confrontation Clause rights with respect to Agent Erickson.

Not all Confrontation Clause violations require reversal of a judgment of conviction, however. In *Van Arsdall*, the Supreme Court held that:

> the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to ... harmless-error analysis. *The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.*

*Id.* at 684, 106 S.Ct. at 1438 (citation omitted) (emphasis added); *Merritt*, 842 P.2d at 169. Among the factors that a court should consider are:

> the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and of course, the overall strength of the prosecution's case.

*Id.; Merritt*, 842 P.2d at 169. In the past, we have held that an error in excluding evidence as to a certain fact is harmless where the fact is fully established by other evidence. *Denver Pressed Brick Co. v. Young*, 49 Colo. 498, 501, 113 P. 499, 500 (1911).

In this instance, we find that the exclusion of the testimony in question was harmless error. The potential bias of the DEA agents who testified against Vega was demonstrated through cross-examination testimony not involving internal DEA procedures. Vega's

questioning revealed both the agents' desire for the delivery of a large quantity of drugs to Colorado and that agents deliberately talked extensively with the defendants during the videotaped transaction about the quantity of drugs that could be delivered in the future in order to obtain a conviction with a higher classification. Moreover, their interest in the outcome of the proceedings was evident to the jury purely as a consequence of their knowledge of the agents' occupation—it is a DEA agent's job to obtain convictions for drug related offenses. While this information may not have demonstrated DEA agents' interest in the outcome of the case as strongly as the excluded testimony, this information was essentially the same information that Vega highlighted as relevant in his initial offer of proof.

Based on Vega's ability to elicit such information bearing on the credibility of the DEA agents' testimony through alternative avenues of cross-examination, we find that the trial court's decision to exclude testimony concerning internal DEA incentives was harmless beyond a reasonable doubt. Therefore, we hold that, while the trial court limited cross-examination of Agent Erickson in violation of the Confrontation Clause by excluding this testimony, the violation does not require us to reverse the trial court's judgment of conviction.

## V.

In conclusion, we hold that Vega was not entitled to an affirmative defense to the special offender charge against him. Thus, the trial court did not deny Vega due process of law nor the right to trial by jury in disallowing his affirmative defense of entrapment. We also find that, while the trial court's exclusion of Agent Erickson's testimony concerning internal DEA incentives for conviction of drug offenders violated Vega's Confrontation Clause rights, the exclusion was nevertheless harmless error. Accordingly, we affirm the judgment of the court of appeals.